UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DARRYL HOLMES,                                          :

                                                        :

                              Petitioner,               :          03 Civ. 7065 (LAP) (GWG)

                                                        :
        -v.-                                                        REPORT AND
                                                        :          RECOMMENDATION

DALE ARTUS,                                             :
Superintendent, Clinton Correctional
Facility                                                :

                              Respondent.               :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        On December 5, 1995, in the New York State Supreme Court, New York County,

petitioner Darryl Holmes was convicted following a jury trial of one count of Murder in the

Second Degree (N.Y. Penal Law § 125.25), one count of Criminal Possession of a Weapon in the

Second Degree (N.Y. Penal Law § 265.03), and one count of Criminal Possession of a Weapon

in the Third Degree (N.Y. Penal Law § 265.02).  On January 10, 1996, Holmes was sentenced to

concurrent prison terms of 25 years to life, 7-1/2 to 15 years, and 3-1/2 to 7 years respectively.

        Holmes, who is currently incarcerated at the Green Haven Correctional Facility in

Stormville, New York, has petitioned this Court under 28 U.S.C. § 2254 for a writ of habeas

corpus.  For the reasons stated below, his petition should be denied.

I. INTRODUCTION

        Holmes's conviction arose from the murder of Nathaniel Brown (referred to herein either

as "Brown" or by his full name) at 1806 Amsterdam Avenue in Manhattan on October 14, 1994.

Holmes was indicted on October 25, 1994.

A.  Pre-Trial Proceedings

_____Prior to trial, a hearing was held pursuant to <u>United States v. Wade</u>, 388 U.S. 218 (1967) in response to Holmes's motion to suppress the identification testimony of witnesses who had identified him at a lineup.[1]  At the hearing, Detective Paul Mueller of the New York City Police Department ("NYPD") testified that, shortly after 9:00 p.m. on the night of October 14, 1994, he responded to a shooting at 1806 Amsterdam Avenue.  (Mueller: H. 5-6).[2]  Upon arriving at the scene, Detective Mueller saw a black male, later identified as Nathaniel Brown, lying in the lobby of the building after having been shot.  (Mueller: H. 6).   Detective Mueller received a description of the assailant as being a 5'9" tall "male black, . . . light skinned, black hat, black pants, Desert Storm army jacket, muscular build."  (Mueller: H. 87).  Detective Mueller spoke with two eyewitnesses, Jose Sandoval and Renee Flowers, both of whom described the perpetrator as a "light-skinned . . . stocky" black male in his early-to-mid twenties, weighing approximately 165 pounds, and standing approximately 5'6" tall.  (Mueller: H. 7-8).  Sandoval and Flowers also described the assailant as "wearing a green army jacket" and a "black knit hat." (Mueller: H. 8).

During the course of the investigation, other detectives interviewed a man by the name of Kevin Richardson.  (Mueller: H. 8).  Based upon Richardson's statement, Detective Mueller

_____

[1]The hearing also addressed Holmes's motion to suppress a statement he made to police after being taken into custody.  The motion to suppress the statement was denied by the court and has not been raised in Holmes's habeas petition.  <u>See</u> Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus, filed July 22, 2004 ("Resp. Mem.") (Docket #9), at 2; <u>see</u> <u>generally</u> Petition for a Writ of Habeas Corpus by a Person in State Custody, filed Sept. 11, 2003 ("Petition") (Docket #2).

[2]"H." refers to the hearing transcript and "S." refers to the sentencing minutes.  Both are paginated separately from the trial transcript (cited as "Tr.").

learned that, on the day that Brown was shot, Richardson had accompanied Brown to Staten

Island, where Brown had an argument with his stepdaughter, Rhonda Brown. (Mueller: H. 9).

After the dispute, Richardson drove Nathaniel Brown to 1806 Amsterdam Avenue. (Mueller: H.

9-10). Detective Mueller also learned that, at some point that same evening, a black male who fit

the description of the shooter was at Richardson's residence, located at 14 West 102nd Street in

Manhattan, looking for both Richardson and Nathaniel Brown. (See Mueller: H. 10). Mueller

subsequently learned that Holmes was Rhonda Brown's boyfriend. (Mueller: H. 12).

Holmes was taken into custody by Detective Brian Speer of the NYPD on October 15,

1994. (Mueller: H. 13; Speer: H. 122-23). Detective Speer said that he knew Holmes by his

nickname, "Light," which was given to him because of his light complexion. (Speer: H. 120).

Detective Speer had seen Holmes on "at least" forty occasions and thought that Holmes's

physical characteristics matched the description of the shooter. (Speer: H. 121). Detective Speer

also had seen Holmes wearing an army jacket. (Speer: H. 121-22). Holmes testified that he was

5'11" tall and that, at the time he was taken into custody, he weighed approximately 230 pounds.

(Holmes: H. 159).

That same evening, Detective Mueller prepared to place Holmes in a lineup. (See

Mueller: H. 33-34). The lineup consisted of six individuals, including Holmes. (See Mueller:

H. 36). Once the lineup fillers arrived, the fillers and Holmes were placed in the same interview

room at the precinct house. (Mueller: H. 34). Of the six participants in the lineup, two of the

individuals, including Holmes, had a lighter skin tone than the other four lineup participants.

(Mueller: H. 74). Although Mueller noticed the differences in complexion between the lineup

participants, he did not make any attempt to find other fillers who had a skin tone that more

closely resembled Holmes's. (Mueller: H. 75). Holmes selected position number two in the lineup. (Mueller: H. 36). A photograph of the lineup was admitted into evidence at the hearing. (H. 35); see Lineup Photograph (annexed as Ex. D to Petition) ("Lineup Photograph"). The lineup photograph shows that the other light-skinned lineup participant was seated in position number five in the lineup. See Lineup Photograph.

Howard Sails was the first individual to view the lineup. (Mueller: H. 37). Sails worked as a security guard at 14 West 102nd Street, the building in which Richardson lived. (See Mueller: H. 10, 37). Sails informed police that he had seen an individual enter the premises at 14 West 102nd Street on the evening of October 14, 1994 looking for Richardson and Brown. (See Mueller: H. 10-11). Prior to viewing the lineup, Sails was shown a videotape taken from a camera in the building that depicted the person Sails had seen enter the premises. (See Mueller: H. 80). After viewing the lineup, Sails recognized Holmes and stated that he was "eighty percent sure" that Holmes was the individual he saw enter the building. (See Mueller: H. 37). In an interview conducted after the identification, Sails informed Detective Mueller that the person whom he saw enter the building was an individual whom he had never seen before and had not seen since. (Mueller: H. 81-82).

The hearing court granted defense counsel's motion to introduce the grand jury testimony of the witnesses who viewed the lineup. (See H. 158-59). When Sails was asked during his grand jury testimony what he could say about the individual he selected at the lineup, he responded: "Well, the guy from number two, the guy who [was] holding number two, he was light skinned, he was a little stocky." Sails' Grand Jury Testimony (reproduced as Ex. E to Petition) ("Sails' Grand Jury Testimony"), at 42. When the prosecutor pressed Sails to state

where he recognized number two from and where he had last seen him, Sails responded that

number two "could have been the guy" he saw while working at 14 West 102nd Street. See id.

In response to a question from the prosecutor concerning the level of certainty in his

identification, Sails said it "[c]ould have been like 70 to 80 percent" and then added that he

"wasn't quite sure." Id.; see also H. 212 (defense counsel reading these portions of Sails' grand

jury testimony into the record).

The next person to view the lineup was Jose Sandoval. (Mueller: H. 38). Sandoval was

an employee of the liquor store located next door to 1806 Amsterdam Avenue. (See Mueller:

H. 46). Upon viewing the lineup, Sandoval "indicated . . . that he was either choosing number 2

or number 5" as the person he saw in the vicinity of 1806 Amsterdam Avenue on the night in

question. (See Mueller: H. 39). At Sandoval's request, the lineup participants stood up.

(Mueller: H. 39). Sandoval chose Holmes as the person he had seen on the night in question.

(Mueller: H. 39). In his grand jury testimony, however, Sandoval testified that, upon his request,

only Holmes and the individual seated in position number five stood up. See Sandoval's Grand

Jury Testimony (reproduced as Ex. E to Petition) ("Sandoval's Grand Jury Testimony"), at 104.

At that time, Sandoval told the detective that Holmes was "most like" the man he saw in the

vicinity of 1806 Amsterdam Avenue "because of [his] color and [his] weight, his height, and the

way he stood up." See id. at 105. Sandoval testified before the grand jury that Holmes's features

were "more similar" to the features of Brown's attacker than the other participants in the lineup.

See id. at 103-04; accord H. 213. When asked if he was able to tell the detective that he was

"sure" that Holmes was the man he observed, Sandoval responded by stating that Holmes "was

the person who had the most features like him."  See Sandoval's Grand Jury Testimony at 105;
accord H. 213-14.

The next person to view the lineup was Alejandro DeJesus (a/k/a Niko Dellacruz), who
was present at the scene at the time of the incident in question.  (Mueller: H. 40, 48-49).[3]  Upon
viewing the lineup, DeJesus did not identify anyone as the perpetrator.  (Mueller: H. 40).

The final person to view the lineup was Renee Flowers, who was also an eyewitness.
(Mueller: H. 7, 41).  Upon viewing the lineup, Flowers indicated that she recognized Holmes.
(See Mueller: H. 41).  Before the grand jury, Flowers testified that she selected Holmes at the
lineup because he had "the same features" as the man she saw at 1806 Amsterdam Avenue on the
night that Brown was shot.  See Flowers' Grand Jury Testimony (reproduced as Ex. E to Petition)
("Flowers' Grand Jury Testimony"), at 17.  During the course of her grand jury testimony,
however – in a portion that was admitted at the Wade hearing (H. 158-59) and read into the
record at trial – Flowers stated that the reason she had picked Holmes at the lineup was "because
of his complexion" and because he was "light skinned and his features looked the same" as the
perpetrator.  (Tr. 890-91).  Flowers then further described what led her to identify Holmes as the
perpetrator at the lineup:

> Q.  Can you tell us what your level of certainty is or was on Saturday, October 15, 1994,
> when you selected . . . number two in the lineup that you saw at the 30th Precinct?
> A.  All right.  I seen that he was light skinned and the, first of all, he was, you know, the
> lightest one that I've seen there and I felt that, you know, this was the individual. . . .
> Q.  Was the man that you selected in the lineup the man holding the number two, was he
> similar in appearance to the man in the hat which you had seen . . . on October 14, 1994?
> A.  Yes, he appeared to be the gentleman.

-----

[3]This witness is referred to in the hearing transcript as "Niko Dellacruz" and in the trial
transcript as "Alejandro DeJesus," though they are apparently the same person.  (See Mueller: Tr.
1154).  For purposes of consistency, he will be referred to as "DeJesus."

Q. And what is -- can you tell us about your level of certainty regarding your identification, can you talk about that at all?
A. I only can say certainly about the clothes and that's what I can say in his complexion, and like I said, all I saw was the side of him.

Flowers' Grand Jury Testimony at 52-53.

_____The trial court concluded that there was no police suggestiveness in the lineup and thus rejected Holmes's motion to suppress the identification testimony. (H. 221, 247). Although acknowledging that the witnesses' descriptions of the perpetrator focused upon his light complexion, the court stated that case law did not require that fillers in a lineup have a complexion identical to the subject of the lineup. (See H. 245-46). In reaching its decision, the court also emphasized the fact that the witnesses had not made definitive identifications. (H. 246). Specifically, the court commented that if the police were attempting to be suggestive in this instance, they "did a miserable job of it because they have witnesses who are uncertain" in their identification of Holmes as Brown's attacker. (H. 220).

B. The Evidence Presented at Trial

1. The People's Case

On the afternoon of October 14, 1994, Kevin Richardson drove Nathaniel Brown to see Karen Brown, his estranged wife, at her home in Staten Island. (See Richardson: Tr. 478-80, 482, 484-86; K. Brown: Tr. 261-63).[4] Shortly after arriving at the house, Nathaniel Brown got into an argument with Rhonda Brown, his stepdaughter, during the course of which Brown hit or grabbed Rhonda. (See K. Brown: Tr. 263-65; Richardson: Tr. 480-81, 488-89). As Rhonda attempted to exit the apartment, Brown grabbed her by the arm, and, subsequently, the two slid

_____

[4]Nathaniel Brown is sometimes referred to in the transcript by his nickname "Pop" or "Poppy."

down a nearby stairway. (Richardson: Tr. 489). After reaching the bottom of the stairway, Rhonda yelled at Brown, "'you're dead mother fucker. You're dead.'" (Richardson: Tr. 489). Following the altercation, Nathaniel Brown and Richardson returned to Manhattan, and Karen Brown called the police to report the argument. (See Richardson: Tr. 489-90; K. Brown: Tr. 1026-28). Upon returning to Manhattan, Richardson dropped Nathaniel Brown off at 1806 Amsterdam Avenue at approximately 8:40 or 8:45 p.m. (Richardson: Tr. 490).

Following the incident, Karen heard Rhonda speaking on the telephone. (K. Brown: Tr. 268). Because Rhonda was crying and shaking, Karen took the telephone from her. (K. Brown: Tr. 268). At the other end of the line was Holmes, Rhonda's boyfriend, who was informed by Karen that Rhonda had had an argument with Nathaniel Brown. (See K. Brown: Tr. 268-70; Lamar: Tr. 298). Holmes asked Karen where Nathaniel Brown was and she informed him that he was either at Richardson's apartment located on 102nd Street or at his own apartment located at 1806 Amsterdam Avenue. (K. Brown: Tr. 270).

At approximately 8:30 p.m. that evening, Sails, a security guard at Richardson's apartment complex, was approached by a man outside of the security booth where he was working. (Sails: Tr. 691-92, 696-98, 705). Sails described the man as a "light skinned" black male in his twenties, with a "stocky" build between 5'9" and 6'0" tall. (Sails: Tr. 699-700). The man was wearing a black knit hat which was covering his eyebrows and a "greenish gray" jacket with the collar turned up. (Sails: Tr. 700-01). Although the area around the security booth was well-lit, Sails testified that it was difficult to see the man's face because the hat he was wearing "was pulled low over his eyebrows" and because his collar was turned up. (Sails: Tr. 720, 722). As the man approached, he asked Sails about an address located at "102 Central Park and

Columbus." (Sails: Tr. 701). After Sails informed him there was no such address, the man made a call on his cell phone. (Sails: Tr. 701-04). Phone records showed that a call was placed at about this time from this cell phone to Karen Brown. See Resp. Mem. at 12 (citing telephone records admitted at trial as Exhibits 19A and 19B). Karen Brown also testified that Holmes called her that evening, asking about Richardson's name and confirming his apartment number – thus suggesting to her that he was actually at the 102nd Street address when he called. (K. Brown: Tr. 273-74).

After placing the phone call, the man requested that Sails ring the buzzer to Richardson's apartment. (Sails: Tr. 704-05). After buzzing Richardson's apartment, Richardson's son told Sails to send the man up and Sails did so after the man signed his name "S. Jenkins" in a visitors logbook. (Sails: Tr. 705, 708, 723; R. Richardson: Tr. 1279-80). The parties stipulated that the logbook signature matched a sample of Holmes's handwriting introduced at trial. (See Tr. 1433). In addition, the parties stipulated that Holmes had used the name "Darvin Jenkins" as an alias in the past. (Tr. 1433).

Richardson's son, who was ten years old at the time he testified, opened the door to the apartment and the visitor asked if he knew of Nathaniel Brown's whereabouts. (See R. Richardson: 1276, 1281-82). Richardson's son informed him that he did not know where Brown or his father were at the time. (R. Richardson: Tr. 1281-82). Sails never saw the man leave the building. (Sails: Tr. 753).

Later that same evening, Sails, along with several detectives, watched a videotape from a surveillance camera that videotaped anyone entering and exiting the building. (Sails: Tr. 709-11; Smoot: Tr. 1090). The videotape was played in open court during the course of the trial. (Sails:

Tr. 720-22). Sails could not recall if he reviewed the videotape with detectives before or after describing the individual who approached him at the security booth to police. (Sails: Tr. 749). In Rhonda Brown's grand jury testimony, which was admitted into evidence at trial, she testified that she recognized Holmes upon viewing the videotape. (Tr. 1448-49).

Holmes called Karen Brown a second time that evening to ask the other address she had given him and to confirm that it was 1806 Amsterdam Avenue, Apartment 4B3. (K. Brown: Tr. 275). At this time, Karen Brown again provided Holmes with the address. (K. Brown: Tr. 275).

At approximately 9:00 p.m. that same evening, Nathaniel Brown entered the liquor store adjacent to 1806 Amsterdam Avenue and began a discussion with Jose Sandoval, an employee at the store. (Sandoval: Tr. 396-98). Brown and Sandoval continued their conversation outside the store, at which time they were joined by Renee Flowers, who also lived at 1806 Amsterdam Avenue. (Sandoval: Tr. 398, 402; Flowers: Tr. 795, 800-02). During this encounter, Sandoval saw a man standing on a nearby sidewalk. (Sandoval: Tr. 398-99). Sandoval described the man as being approximately 5'10" tall, as having a lighter skin tone than himself and a "very strong" build. (Sandoval: Tr. 399). Sandoval testified that the man was wearing a "dark" winter hat covering the lower part of his forehead, including his eyebrows, and a "brown light jacket" that appeared to be an "army jacket." (Sandoval: Tr. 400-01). When Sandoval first saw the man, the man was looking at the door to 1806 Amsterdam Avenue with his hands in his pockets. (Sandoval: Tr. 401-02, 404). The conversation outside the store lasted "about a minute" and Sandoval reentered the store. (Sandoval: Tr. 404-05).

Flowers and Brown subsequently headed towards the door of 1806 Amsterdam Avenue, where Brown lived on the fourth floor with his girlfriend. (Flowers: Tr. 800, 802). Brown rang the outside intercom to his girlfriend's apartment to let her know that he was coming upstairs. (Flowers: Tr. 802-03). The entrance to 1806 Amsterdam Avenue had two sets of glass doors, one after the other, and each door was locked. (Flowers: Tr. 797-98). Brown unlocked the first door with his key, and he and Flowers entered the building. (Flowers: Tr. 803). At that point a man began to follow them into the building. (Flowers: Tr. 803-04). Flowers described the man as a "light skinned" black male, with a "broad" build, wearing a black ski hat and a "green army jacket." (Flowers: Tr. 804-05). Because the man's black hat came down to his eyebrows, and because the collar to the man's jacket was pulled up to his ears, Flowers could only see the man's face from his eyebrows to his chin. (Flowers: Tr. 805-06). Flowers testified that the man "always had his head down" and that the lighting in the vestibule was "dim" because the only lighting was provided by the outside street lights. (Flowers: Tr. 808, 810).

Flowers and Brown asked the man if they "could . . . help him." (Flowers: Tr. 809). The man informed them that he was there to visit a friend, "Reggie." (Flowers: Tr. 809). Flowers informed the man that "he had the wrong building [since] there was no Reggie that lived there." (Flowers: Tr. 809). In response, the man stated that he knew "Reggie" lived in the building because he had visited him "earlier." (Flowers: Tr. 809-10). At that point, Flowers "got kind of nervous" and turned away from the man. (Flowers: Tr. 810). Brown informed the man that he would not permit him to enter the building. (Flowers: Tr. 810-11). Brown then opened the inner vestibule door and allowed Flowers to enter the building. (Flowers: Tr. 811). The man stuck his foot in the doorway and Brown again informed him that he would not permit him to enter the

building. (Flowers: Tr. 812). Brown told the man that he should use the intercom system and the man made a motion as if he was going to do so. (Flowers: Tr. 812). The man, however, reached into his jacket and pulled out what "looked like the . . . handle of a gun." (Flowers: Tr. 812). As Flowers turned to run down the hallway, she heard two gun shots. (Flowers: Tr. 812-13). Following the shooting, Flowers went to tell Brown's girlfriend that he had been shot. (See Flowers: Tr. 813). When police arrived, Brown was bleeding and laying face up in the lobby of the building underneath the mailboxes. (Mueller: Tr. 1143-44). Brown was taken to St. Luke's Hospital and he subsequently died. (See Mueller: Tr. 1145; Smiddy: Tr. 1295).

Throughout the encounter, Flowers did not get a "complete look" at the shooter's face. (Flowers: Tr. 818; accord Flowers: Tr. 825, 831, 833, 848, 871-72). Flowers testified that the man's clothing, specifically, the fact that "his hat [was] pulled down and his coat pulled up," prevented her from observing the man's face. (Flowers: Tr. 818). In fact, Flowers indicated that she did not look at the man who eventually shot Brown because she was "scared." (Flowers: Tr. 872).

Sandoval and DeJesus, another liquor store employee, heard two gun shots coming from the building next door. (Sandoval: Tr. 411-12; DeJesus: Tr. 899, 902-03). As Sandoval went to the door of the liquor store, he saw the man in the "army jacket" that he had previously seen standing on the sidewalk walk past him with his hands in his pockets and his head facing down. (Sandoval: Tr. 412-13). Sandoval indicated that he was unable "to get a good look" at the man's face "because [the man] always had his head down." (Sandoval: Tr. 416). Sandoval, however, testified that it was "the color of [the man's] skin" that "stayed in [his] mind." (Sandoval: Tr. 450-51). Although DeJesus did not see the man's face, he stated that the man was

approximately 5'8" or 5'10" tall. (DeJesus: Tr. 907, 914). DeJesus testified that the assailant

wore a black winter hat and an "olive green" or "green" military jacket with the collar "[a] little

lifted up." (DeJesus: Tr. 903-05).

Following the shooting, Sandoval, Richardson, Rhonda Brown, Flowers, and Sails gave

statements to the police. (Sandoval: Tr. 462; Richardson: Tr. 496; R. Brown: Tr. 599; Flowers:

Tr. 823-24; Sails: Tr. 709). Holmes was taken into custody at about 4:00 or 4:30 p.m. on

October 15, 1994. (See Speer: Tr. 515; Mueller: Tr. 1149-50). At the time, Holmes had several

toothpicks, a black knit hat, and a cellular phone in his possession. (Mueller: Tr. 1150, 1157-59,

1242, 1261-62). In fact, Holmes was wearing the black knit hat when he was taken into custody.

(Mueller: Tr. 1242; Speer: Tr. 515).[5] The videotape retrieved from the 14 West 102nd Street

security booth showed that the individual seeking to gain entrance to Richardson's apartment was

holding a cellular phone and had a toothpick in his mouth. (See Mueller: Tr. 1149, 1262).

Detective Mueller also testified that the man he "viewed in the video was wearing a green army

jacket and a black knit hat" and that this clothing "correspond[ed]" with the eyewitnesses'

descriptions of the perpetrator's clothing. (Mueller: Tr. 1262). At the time of his arrest, Holmes

informed Detective Mueller that he was 5'8" tall and weighed 185 pounds. (Mueller: Tr. 1262).

The police conducted a lineup that included Holmes later that evening. (Mueller:

Tr. 1151-52). Holmes chose to sit in position number two in the lineup. (Mueller: Tr. 1154-55).

At trial, Sails, Sandoval, DeJesus, and Flowers all testified regarding what occurred at the lineup.

(See, e.g., Sails: Tr. 716-19; Sandoval: Tr. 417-19, 452-54; DeJesus: Tr. 912-13, 917-25;

---

[5]Detective Mueller testified that, after he returned the black knit hat to Holmes, he observed Holmes "trying to tear [the hat] in half." (Mueller: Tr. 1151; accord Speer: Tr. 516).

Flowers: Tr. 816-19, 821, 856-59, 861-64, 890-92). None of the witnesses, however, made an in-court identification of Holmes. Resp. Mem. at 27.

After being shown a picture of the lineup, Sails testified that "the man holding number 2 could have been the person" that approached him at the security booth on October 14, 1994. (See Sails: Tr. 717-18). At the time of the lineup, Sails was "[a]bout seventy to eighty percent" certain that Holmes was the individual he observed from his security booth. (Sails: Tr. 718).

Sandoval testified that the two individuals that looked most similar to the perpetrator were Holmes and the individual seated in position number five "because of the color of their skin." (Sandoval: Tr. 417). Sandoval testified that Holmes and the individual seated in position number five were the only lineup participants who came close to his description of the perpetrator. (Sandoval: Tr. 452). As a result, Sandoval directed his attention solely towards those two individuals. (Sandoval: Tr. 452). Sandoval requested that Holmes and the individual seated in position number five stand up and take a step forward, and he was then able to observe their build and height. (Sandoval: Tr. 418). Based upon his observation, Sandoval concluded that Holmes had characteristics "similar" to "the man in the army jacket" that he saw standing on the sidewalk on the night that Brown was shot. (See Sandoval: Tr. 419). Specifically, Sandoval stated that Holmes's skin tone, complexion, height and build were "similar" to those of the perpetrator. (Sandoval: Tr. 419).

DeJesus testified that Holmes was "similar" in appearance to the man he had seen following Brown's shooting. (DeJesus: Tr. 918-20). DeJesus, however, did not identify anyone at the pre-trial lineup. (DeJesus: Tr. 912-13). DeJesus refused to identify Holmes at the pre-trial

lineup because he was concerned about implicating someone who could be innocent. (DeJesus: Tr. 918-19).

Flowers testified as follows concerning what led her to recognize Holmes at the lineup as the assailant who shot Brown:

> Q. When you looked at the line-up, were you able to compare anyone in the line-up to the man who did the shooting the night before?
> A. I had -- when I saw the line-up, I said that the guy was light. Okay? And I went with that I saw a light person there and the shoulders and that's who I said it looked like.
> Q. And what number was that person in the line-up?
> A. It was Number 2.
> Q. Now, could you be sure Number 2 was the same guy as you had seen?
> A. No, I wasn't sure.

(Flowers: Tr. 817-18). Flowers testified that Holmes was the only person in the lineup with a complexion that was similar to that of the perpetrator. (Flowers: Tr. 857). Based upon her observation at the pre-trial lineup, Flowers testified that Holmes had "similar" characteristics to the man she saw shoot Brown in terms of his height, his build, and his skin tone. (See Flowers: Tr. 818-19).

### 2. The Defense Case

On October 14, 1994, at approximately 7:40 p.m., police officer Christopher Albano, who was assigned to the 120th Precinct in Staten Island, responded to a call at the home of Karen Brown. (See Albano: Tr. 1125). Upon arriving, he was informed by Karen and her daughter that they "were being harassed by an ex-husband." (Albano: Tr. 1127-28). Officer Albano's complaint report stated that the alleged harassment violated a family court order of protection. (Albano: Tr. 1129). Neither woman reported to Officer Albano at the time that they had been assaulted or suffered any injuries. (Albano: Tr. 1129).

Detective Richard O'Brien of the 122nd Precinct in Staten Island was notified, through a complaint filed by Karen Brown, that Nathaniel Brown violated a family court order of protection. (O'Brien: Tr. 1457-59). On October 15, 1994, Detective O'Brien spoke with Karen Brown in reference to her complaint. (O'Brien: Tr. 1459-60). During the course of their conversation, Karen did not mention to Detective O'Brien that either she or her daughter had been assaulted by Brown. (O'Brien: Tr. 1467). Karen informed Detective O'Brien of Brown's death and the case was subsequently closed. (O'Brien: Tr. 1464, 1466-67).

Private Investigator Timothy Stewart, a retired NYPD detective, testified as an expert in lineup preparation and the application of the NYPD Patrol Guide. (Stewart: Tr. 1471-72, 1478-80, 1482, 1497, 1527-28). Stewart explained that, in locating fillers for a lineup, police should find participants who are similar in appearance to the suspect, and that attempts should be made to find participants with a complexion similar to that of the suspect. (Stewart: Tr. 1492, 1513).

C.  Verdict and Sentencing

On December 5, 1995, a jury convicted Holmes of one count of Murder in the Second Degree (N.Y. Penal Law § 125.25), one count of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03), and one count of Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02). (Tr. 1689-90). On January 10, 1996, Holmes was sentenced on these counts to concurrent, indeterminate prison terms of 25 years to life, 7-1/2 to 15 years, and 3-1/2 to 7 years respectively. (S. 19).

D.  Direct State Court Appeals

Holmes appealed his conviction to the Appellate Division, First Department. In his brief, Holmes raised four issues, one of which set forth his claim that the pre-trial lineup was unduly

16

suggestive.  See Brief for Defendant-Appellant, dated Aug. 6, 2001 (reproduced as Ex. A to

Petition).  Specifically, Holmes contended that his right to due process under both the federal and

state constitutions was violated as a result of the "improperly suggestive identification

procedure" employed at the pre-trial lineup identifications and the testimony regarding the lineup

at trial.  Id. at 18.

On February 7, 2002, the Appellate Division unanimously affirmed Holmes's conviction.

People v. Holmes, 291 A.D.2d 247, 247 (1st Dep't 2002).  The Appellate Division held, inter

alia, that the trial court properly denied Holmes's motion to suppress the pre-trial lineup

identifications, concluding that the lineup itself was not unduly suggestive.  Id.

By letter applications dated April 4, 2002 and April 30, 2002, Holmes sought leave to

appeal to the New York Court of Appeals.  See Letter from Eunice C. Lee, Esq. to the Hon.

Judith S. Kaye, dated Apr. 4, 2002 (reproduced as Ex. C to Petition), at 1; Letter from Eunice C.

Lee, Esq. to the Hon. Richard C. Wesley, dated Apr. 30, 2002 (reproduced as Ex. C to Petition)

("Apr. 30 Letter"), at 2-4.  In the April 30, 2002 letter, Holmes raised the issue relating to the

suggestiveness of the pre-trial lineup.  See Apr. 30 Letter at 2-4.  Holmes's application for leave

to appeal to the New York Court of Appeals was denied on June 14, 2002.  People v. Holmes, 98

N.Y.2d 676 (2002).

E.  The Instant Petition

On September 11, 2003, Holmes timely submitted the instant habeas corpus petition to

this Court along with a memorandum of law in support of his petition.  See Petition;

Memorandum in Support of Petition for Writ of Habeas Corpus, filed Sept. 11, 2003 (Docket #3)

("Pet. Mem.").  The respondent filed opposition papers on July 22, 2004.  See Resp. Mem.;

Answering Affirmation, filed July 22, 2004 (Docket #7).  Holmes filed a reply memorandum of law on August 30, 2004.  See Reply Memorandum in Support of Petition for Writ of Habeas Corpus, filed Aug. 30, 2004 (Docket #11).

In his petition, Holmes contends that he was denied his right to due process of law "because his conviction was obtained through the use of unreliable witness identifications made at a lineup that was unduly suggestive."  Petition ¶ 11.  Holmes argues that, when judged by the "totality of the circumstances," including the witnesses' descriptions of the perpetrator as being light skinned and stocky and the fact that Holmes was the only lineup participant matching that description, the lineup was impermissibly suggestive.  See Pet. Mem. at 18; Petition ¶ 50.

II.  DISCUSSION

    A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  For a state court claim to be "adjudicated on the merits," the state court need only base its decision "on the substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted).  It is not necessary for the state court to refer to the federal aspect of a claim or any federal law for the deferential standard to apply.  Id. at 312.

The claim raised by Holmes in his habeas petition regarding the suggestiveness of the pre-trial lineup was "adjudicated on the merits" by the Appellate Division. The Appellate Division, after stating that it had reviewed the photograph of the lineup as well as other evidence adduced at the <u>Wade</u> hearing, concluded that "the lineup participants were sufficiently similar in appearance" to Holmes such that the lineup was not unnecessarily suggestive. <u>Holmes</u>, 291 A.D.2d at 247. The Appellate Division also found that the photograph did not indicate that there was any "noticeable difference in the body size of the [lineup] participants." <u>Id.</u> The court also asserted that "[t]he lineup was not rendered suggestive by the fact that defendant and one of the fillers seem to have had a lighter skin tone than the rest of the participants." <u>Id.</u> (citing cases). In reaching its decision, the court acknowledged that several of "the witnesses mentioned defendant's body type and skin tone in their description of the perpetrator." <u>Id.</u> Nevertheless, the court reasoned that, "any minor discrepancies" between Holmes's characteristics as compared to the other lineup participants, "when considered together with the similarities in age, height and overall appearance of the participants in the lineups, were insufficient to distinguish defendant." <u>Id.</u> (citation omitted). As a result, the Appellate Division concluded that the trial court properly denied Holmes's motion to suppress the identification testimony. <u>Id.</u> Because the Appellate Division, in rejecting Holmes's claim, based its decision on the "substance" of the claim – namely, whether the pre-trial lineup identification was unnecessarily suggestive – the state court adjudicated this claim "on the merits." <u>Sellan</u>, 261 F.3d at 311.

This Court, therefore, will apply the deferential standard of review articulated in 28 U.S.C. § 2254(d) to that claim. Under this standard, this Court may grant relief with respect to a determination on a legal question only if the Appellate Division's adjudication resulted in a

decision that contradicted or unreasonably applied the governing law set forth in Supreme Court precedent, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." <u>Id.</u> at 411. Rather, the state court's application must have been "objectively unreasonable." <u>Id.</u> at 409.

With respect to a factual determination, this Court may grant a writ of habeas corpus only if the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Also, under 28 U.S.C. § 2254(e)(1), a state court's determination of a factual issue is "presumed to be correct" and that presumption may be rebutted only "by clear and convincing evidence."

As is discussed in Section II.D.1 below, the Court is applying this standard of review only to the question of the suggestiveness of the identifications – not the question of whether the admission of the identifications constituted harmless error.

B. <u>Eyewitness Identifications and Due Process</u>

A pre-trial identification will be excluded "only if the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification

20

that [the defendant] was denied due process of law.'" United States v. Bautista, 23 F.3d 726, 729

(2d Cir.) (quoting Stovall v. Denno, 388 U.S. 293, 302 (1967)), cert. denied, 513 U.S. 862 (1994)

(alteration in original).  Thus, a pre-trial identification implicates the due process clause only

when there is "'a very substantial likelihood of irreparable misidentification.'" Manson v.

Brathwaite, 432 U.S. 98, 122 (1977) (quoting Simmons v. United States, 390 U.S. 377, 384

(1968)).  The Second Circuit has enunciated the following test for determining whether an

identification procedure violates due process:

> [A] sequential inquiry is required in order to determine whether either the prior
> identification or an in-court identification of the defendant at trial is admissible.
> The court must first determine whether the pretrial identification procedures
> unduly and unnecessarily suggested that the defendant was the perpetrator. . . .
> If the procedures were not suggestive, the identification evidence presents no
> due process obstacle to admissibility, [and] no further inquiry by the court is
> required. . . .  If the court finds, however, that the procedures were suggestive,
> it must then determine whether the identification was nonetheless independently
> reliable. . . .  In sum, the identification evidence will be admissible if (a) the
> procedures were not suggestive or (b) the identification has independent
> reliability.

Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001), cert. denied, 534 U.S. 1118 (2002) (citations

omitted).

The determination of whether a pre-trial identification was suggestive is a mixed question

of law and fact.  See Sumner v. Mata, 455 U.S. 591, 597 (1982).  As a result, the statutory

presumption of correctness that exists as to a state court's factual findings on habeas review, see

28 U.S.C. § 2254(e)(1), does not apply in determining the constitutionality of the procedures in

this instance.  Sumner, 455 U.S. at 597 n.10; accord Alvarez v. Keane, 92 F. Supp. 2d 137, 152

(E.D.N.Y. 2000).  However, the statutory presumption of correctness does apply to any pure

determination of fact made by the state courts.  See Sumner, 455 U.S. at 597; accord Alvarez, 92

F. Supp. 2d at 152.

      C.  The Identification Testimony

          1.  The Suggestiveness of the Lineup

      Holmes argues that the lineup identification was unduly suggestive because he was the

only participant in the lineup who was both light-skinned and stocky.  Pet. Mem. at 18-20.

Holmes contends that there was only one other light skinned black male participant in the lineup,

and that, in comparison with this individual, only Holmes possessed the "stocky build" described

by the witnesses.  Id. at 19; accord Petition ¶ 27.  Therefore, according to Holmes, he was the

only participant in the lineup matching the witnesses' descriptions of the perpetrator as a light

skinned, stocky black male.  Pet. Mem. at 18-19; accord Petition ¶¶ 26-27.

      Suggestive identification procedures are those that "'increase the likelihood of

misidentification,' and '[i]t is the likelihood of misidentification which violates a defendant's

right to due process.'"  Raheem, 257 F.3d at 133-34 (quoting Neil v. Biggers, 409 U.S. 188, 198

(1972)) (alteration in original).  The Supreme Court has made clear that the right to due process

implicates a defendant's right not to be the object of a suggestive police identification procedure

that creates "a very substantial likelihood of irreparable misidentification."  Simmons, 390 U.S.

at 384; accord Solomon v. Smith, 645 F.2d 1179, 1190-91 (2d Cir. 1981).

      The Second Circuit has held that "[a] lineup is unduly suggestive as to a given defendant

if he meets the description of the perpetrator previously given by the witness and the other lineup

participants obviously do not."  Raheem, 257 F.3d at 134; accord Frazier v. New York, 187 F.

Supp. 2d 102, 110 (S.D.N.Y. 2002).  A lineup, therefore, is unduly suggestive "[w]here one

witness has emphasized a particular characteristic of the perpetrator in giving a description to the police," and the person who is the object of the lineup is the only lineup participant to have that characteristic.  Raheem, 257 F.3d at 134; see also Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986) (the central question in determining the suggestiveness of a photo array is "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit'") (quoting United States v. Archibald, 734 F.2d 938, 940 (2d Cir. 1984)) (alteration in original).  The Second Circuit has cautioned that "'[l]ineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification.'"  Raheem, 257 F.3d at 134 (quoting Israel v. Odom, 521 F.2d 1370, 1374 (7th Cir. 1975)).

In Raheem, the state courts found that the lineup in which the defendant was identified was not unduly suggestive, despite the fact that witnesses had described the perpetrator as wearing a three-quarter length black leather jacket and the defendant was the only lineup participant who wore such a jacket.  See 257 F.3d at 125, 127-31.  The Second Circuit, however, concluded that the lineup was "plainly suggestive" as to the witnesses who identified the defendant at the lineup.  Id. at 135-36.  In reaching this conclusion, the Second Circuit considered it significant that "the most prominent feature that had been mentioned by [the witnesses] in their descriptions to the police was the shooter's black leather coat."  Id. at 137.  The court also found that the black leather coat "was a critical factor in those witnesses' selection of [the defendant] from the lineup."  Id.  Specifically, the court noted that the witnesses who selected the defendant

from the lineup "clearly indicated that their selection of [him] was influenced by his wearing such a coat." Id. Therefore, because the only witnesses who selected the defendant from the lineup "had noticed and described to the police the shooter's coat," and because the defendant was "the only participant in the lineup wearing such a coat," the Second Circuit found that the lineup was unnecessarily suggestive. Id.

Similarly, Solomon held that the pre-trial identification procedures at issue were suggestive where, inter alia, the perpetrator of the crime had been described by witnesses as being 5'7" tall and weighing 145 pounds, and a lineup was held in which the defendant, who was 5'6" tall and weighed 130 pounds, was the only person who came close to matching that description. 645 F.2d at 1183, 1185. The court found that the lineup was suggestive due in part to the fact that all but one of the other lineup participants were four to eight inches taller than the defendant, and the only other lineup participant who was not considerably taller than the defendant was more than 65 pounds heavier than him. See id.; see also Israel, 521 F.2d at 1374 (where eyeglasses were "the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police," a lineup in which the defendant was the only person wearing eyeglasses was unnecessarily suggestive); Frazier, 187 F. Supp. 2d at 111 (lineup unduly suggestive where the defendant "was the only participant who had alternating-length dreadlocks, and this hairstyle was the only consistent, distinctive feature in [the victim's] various descriptions").

Here, many of the identifying witness described the assailant as having a light complexion and a stocky build. From either a fellow police officer or the police dispatcher, Detective Mueller learned that the shooter had been a light skinned black male with a muscular

24

build, standing approximately 5'9" tall. (Mueller: H. 87, 91-92). Detective Mueller also spoke with two witnesses, Sandoval and Flowers, both of whom provided him with a similar description. (See Mueller: H. 7-8). Specifically, Sandoval and Flowers described to Detective Mueller that the perpetrator was a "light-skinned . . . stocky" black male. (Mueller: H. 7-8). With respect to Sails, he stated that he had seen a man "fitting the description of the shooter" while working at Richardson's building. (See Mueller: H. 10).

Significantly, Holmes's "light skin" tone and "stocky" build was critical to the witnesses' identification of him at the lineup. Sails testified before the grand jury that, although he initially did not recognize any of the lineup participants, he eventually selected Holmes because "he was light skinned" and "a little stocky." See Sails' Grand Jury Testimony at 41-42. Sandoval testified that one of the reasons he was drawn to Holmes and the other light skinned lineup participant was "because of the color of their skin." (Sandoval: Tr. 417). Sandoval testified before the grand jury that, at the lineup, Holmes was the individual who looked "most like" the perpetrator "because of [his] color and [his] weight, his height, and the way he stood up." Sandoval's Grand Jury Testimony at 105. Flowers testified that Holmes "looked like" the perpetrator at the lineup because "the guy was light" and because of his "shoulders." (Flowers: Tr. 818). Flowers also testified that Holmes was the only lineup participant who had a complexion that resembled the man she had seen at the time of Brown's shooting. (Flowers: Tr. 857). Flowers' grand jury testimony, a portion of which was read into the record during trial, indicated that she selected Holmes at the pre-trial lineup "because of his complexion," because he was "light skinned," and because his features "looked the same" as those of the perpetrator. (Flowers: Tr. 890-91).

The original lineup photograph as introduced at trial has been provided to the Court and the Court has carefully examined it. This photograph provides clear and convincing – indeed, unassailable – evidence that Holmes was the only person in the lineup who could be characterized as both light skinned and heavy or stocky.

The only two individuals who could be characterized as having light skin are Holmes and the person seated in position number five. Notwithstanding defendants' arguments to the contrary, see Resp. Mem. at 30-31, these characteristics are obviously not artifacts of the lighting in the photograph. Indeed, the Appellate Division disagreed with respondent's argument on this score inasmuch as it found that only one person other than Holmes – obviously, the man seated in position number five – could be characterized as light skinned. Holmes, 291 A.D.2d at 247 ("[D]efendant and one of the fillers seem to have had a lighter skin tone than the rest of the participants.") (citations omitted). The respondent has provided no basis for concluding that this finding by the Appellate Division was incorrect.

The photograph also reflects a noticeable difference in torso size between Holmes, who has a broad, thick build, and the man seated in position number five, who possessed an average build. See Lineup Photograph. The fact that all the men in the lineup were wearing jackets and sweatshirts, see Resp. Mem. at 30, does not alter this fact. As a result, Holmes was the only person in the lineup who possessed the two characteristics – light skin tone and stocky build – that the eyewitnesses relied upon in describing the perpetrator to the police.

The hearing court made no factual determination with respect to the body size of the lineup participants. (See H. 220, 233, 245-47). The Appellate Division, however, found that "there was no noticeable difference in the body size of the participants, particularly since they

were all wearing baggy clothing and holding large number cards in front of them." Holmes, 291 A.D.2d at 247 (citation omitted).  This is the type of factual determination made by a state court that is "presumed correct absent clear and convincing evidence to the contrary" pursuant to 28 U.S.C. § 2254(e)(1).  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Here, however, this Court concludes that the lineup photograph constitutes clear and convincing evidence contrary to the state court's factual finding.  Regardless of the clothing worn by the lineup participants, Holmes obviously had a stockier and bulkier build than the only other light skinned lineup participant (that is, the individual seated in position number five).  The Court has confidence in its conclusion on this score not only because of its review of the photograph, but also because the Appellate Division was not in any better position to review the photograph than this Court.  See Wiggins v. Smith, 539 U.S. 510, 528 (2003) (state court's finding that a report recorded incidents of sexual abuse constituted "clear factual error" overcoming presumption of correctness where the Court examined the report and found that it made no mention of sexual abuse); cf. McGhee v. Yukins, 229 F.3d 506, 513 (6th Cir. 2000) (not deferring to the factual determination of a state appellate court under § 2254(e)(1) due, in part, because "the state court of appeals made its determination based on a review of the record, rather than live testimony, so there is no reason to suppose the state court was especially well situated" to make the factual determination).  Because the state courts made "an unreasonable determination of the facts" on this point, 28 U.S.C. § 2254(d)(2), this Court is constrained to reject the Appellate Division's finding.

Inasmuch as Holmes was the only person in the lineup who fit the witnesses' descriptions, this case is indistinguishable from Raheem.  As was the case in Raheem, Holmes's distinctive features were critical to both the witnesses' initial descriptions of the assailant who

shot Brown, as well as their respective identifications of Holmes as that individual.  See 257 F.3d at 125, 127-28, 130-31.  The testimony of the witnesses repeatedly confirmed that Holmes's "light" skin tone and "stocky" build weighed heavily into their decision to identify him (to the extent that they did so) as Brown's attacker at the pre-trial lineup.  In other words, these characteristics were an "integral part" of the witnesses' descriptions to police and a "critical factor" in their selection of Holmes at the lineup.  Raheem, 257 F.3d at 137.  Despite the consistent focus among the witnesses on specific traits possessed by Brown's attacker, Holmes was placed in a lineup where he was the sole participant with those characteristics – a practice that violated "clearly established Federal law, as determined by the Supreme Court of the United States" inasmuch as it produced "a very substantial likelihood of irreparable misidentification." Manson, 432 U.S. at 122 (citation and internal quotation marks omitted).  In light of the witnesses' statements, as well as the disparity in physical appearance between Holmes and the other lineup participants, the lineup was suggestive in that Holmes impermissibly "stood out" from the other lineup participants so as to "suggest" to the witnesses that Holmes "was more likely to be the culprit."  Jarrett, 802 F.2d at 41 (quoting Archibald, 734 F.2d at 940) (internal quotation marks omitted); cf. United States v. Fernandez, 456 F.2d 638, 641-42 (2d Cir. 1972) (photo array suggestive where surveillance video portrayed the perpetrator as a light skinned black man with an afro haircut, and of the six photographs presented to witnesses, only that of defendant showed a black man with a light skin tone and an afro).

The respondent asserts that the lineup in this instance was not suggestive because "there is no requirement that a suspect in a lineup be surrounded by stand-ins who are identical or nearly identical in appearance."  Resp. Mem. at 29 (citing cases).  He contends that "all that is

required is that the members of a lineup sufficiently resemble one another so that the suspect is not made to stand out." Id. (citing cases). According to the respondent, "[s]o long as one or two fillers share the trait in question, the identification procedure is not improperly suggestive." Id. at 31 (citing United States ex rel. Cannon v. Montanye, 486 F.2d 263, 268 (2d Cir. 1973), cert. denied, 416 U.S. 962 (1974)). These arguments are far wide of the mark. Here, the suspect in fact was "made to stand out" and no participants in the lineup other than Holmes shared the identifying characteristics described by the witnesses. Solomon makes clear that a lineup is unduly suggestive in instances where the suspect is the only lineup participant to match the witnesses' descriptions even if the suspect shares some distinguishing characteristic with another participant. See 645 F.2d at 1183, 1185.

The cases cited by the respondent in his brief are irrelevant. In none of these cases was the defendant the sole participant in the lineup fitting the witnesses' descriptions. See, e.g., Jarrett, 802 F.2d at 43 (photo array consisting entirely of females not suggestive where the witnesses consistently described the assailant as a female); Roldan v. Artuz, 78 F. Supp. 2d 260, 262-63, 273-74 (S.D.N.Y. 2000) (lineup not suggestive despite differences in weight and skin tone between the suspect and the other lineup participants where there was no indication that these characteristics were distinctive features focused upon by witnesses in describing the perpetrator). Nor is this an instance where the witnesses who selected the defendant at the lineup did not heavily rely upon the defendant's distinctive features that were made to stand out in deciding to select the defendant. See, e.g., United States v. Wong, 40 F.3d 1347, 1360 (2d Cir. 1994) (lineup not suggestive despite difference in height between the suspect and the other lineup

participants where the witness identified the defendant "because of his facial features"), cert. denied, 516 U.S. 870 (1995).

Montanye is particularly unhelpful to the respondent's argument. See 486 F.2d at 263. In Montanye, the Second Circuit remanded the case to the district court in order to develop a factual record with respect to whether other participants in the lineup were wearing the same colors as the defendant at the lineup. Id. at 267-68. After remand, the Second Circuit affirmed the district court's determination that the lineup was suggestive because the defendant was the only participant in the lineup wearing a green shirt, which was the central aspect of the description given by the victim in describing her attacker to the police. See United States ex rel. Cannon v. Smith, 527 F.2d 702, 703-04 (2d Cir. 1975).

The respondent makes a cursory argument, see Resp. Mem. at 33, that the witnesses' very lack of certainty demonstrates that the lineup had no suggestive force. This argument, however, is contrary to Biggers. Biggers holds that "the level of certainty demonstrated by the witness at the confrontation" is relevant, not to the question of suggestiveness, but rather, to the question of whether an identification was independently reliable. See 409 U.S. at 199. The respondent's point about the witnesses' lack of certainty is not without force, however. Indeed, the lack of witness certainty represents a significant difference between this case and virtually all other cases involving suggestive identifications. The evil that the suggestive identification doctrine is meant to root out is the presentation to jurors of seemingly positive identifications that were generated by an improperly suggestive procedure. Here, however, the jury was presented with highly tentative identifications. The parties have not briefed how this unusual circumstance impacts the doctrinal underpinnings of case law on suggestive identifications. Accordingly, while the lack of

certainty is undoubtedly a critical factor in this case, the Court finds that it is more appropriately treated as part of the harmless error analysis, discussed in section II.D below.

## 2. Independent Reliability

Because the lineup was unduly suggestive, the question remains whether the identifications of Holmes by the witnesses had reliability independent of the suggestive lineup. See Raheem, 257 F.3d at 135 ("If the pretrial process was unduly suggestive, the court must then weigh the 'corrupting effect of the suggestive[ness]' against other factors indicating that the identification may be independently reliable.") (quoting Manson, 432 U.S. at 114) (alteration in original). "In determining whether a witness's in-court identification of the defendant has reliability independent of the unduly suggestive identification procedures," courts will look to a number of factors, including "'[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.'" Id. (quoting Neil, 409 U.S. at 199-200) (alterations in original); accord Solomon, 645 F.2d at 1186. Generally, no one factor is dispositive, and "the question of independent reliability must be assessed in light of the totality of the circumstances." Raheem, 257 F.3d at 135 (citing Neil, 409 U.S. at 199).

The respondent makes no attempt to argue that applying any of these factors would allow a court to conclude that the witnesses' identifications were independently reliable – nor could he, given that the witnesses had no great opportunity to see the defendant, did not focus on his face, and demonstrated a low degree of certainty as to their own identifications.

D.  Harmless Error Analysis

                1.  Standard of Review

      "A habeas petitioner is entitled to relief only if the constitutional error at trial was not harmless."  Brown v. Keane, 355 F.3d 82, 91 (2d Cir. 2004).  "The Supreme Court has set forth two different tests for determining whether an error may be overlooked by reason of its harmlessness."  Id.  In Brecht v. Abrahamson, the Court held that on collateral review of a state conviction, an error will be found to be harmless if it did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'"  507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In Chapman v. California, the Court held that on direct review of a criminal conviction, an error may be overlooked only if it is "harmless beyond a reasonable doubt."  386 U.S. 18, 24 (1967).

Following the passage of AEDPA, the Second Circuit repeatedly questioned "whether . . . the applicable test on habeas review of a state conviction remains the one set forth in Brecht, or instead should be a determination whether the state court's decision was contrary to, or involved an unreasonable application of Chapman."  Brown, 355 F.3d at 91 (internal quotation marks and citations omitted); accord Cotto v. Herbert, 331 F.3d 217, 253 (2d Cir. 2003); Ryan v. Miller, 303 F.3d 231, 254 (2d Cir. 2002); Noble v. Kelly, 246 F.3d 93, 101 n.5 (2d Cir.), cert. denied, 534 U.S. 886 (2001); Loliscio v. Goord, 263 F.3d 178, 185 n.1 (2d Cir. 2001).  Until recently, in each instance in which it was previously faced with the question of which harmless error standard to apply on collateral review of a state court conviction, the Second Circuit "declined to decide the question because [it] concluded that the result was the same under either test."  Brown, 355 F.3d at 91.  Nevertheless, the Second Circuit resolved at least a part of this

question by holding in Gutierrez v. McGinnis, 389 F.3d 300, 306 (2d Cir. 2004), that "when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied Chapman."

Here, the issue of harmless error was never reached in the state courts because the Appellate Division found that no constitutional error had been committed at Holmes's trial.  See Holmes, 291 A.D.2d at 247-48.  The Second Circuit has not yet decided the harmless error standard to apply where, as here, the state courts did not engage in harmless error review.  See Gutierrez, 389 F.3d at 306 ("We do not presently reach the issue of whether or how to apply Brecht where the state court has not engaged in harmless error review, as, of course, those facts are not before us.") (footnote omitted); see also Benn v. Greiner, 402 F.3d 100, 105 (2d Cir. 2005) (post-Gutierrez case declining to decide the harmless error standard to be applied "in the absence of a state court adjudication of harmlessness").[6]  Therefore, it still remains an "open question" in this Circuit which harmless error standard is to be applied under these circumstances.  Benn, 402 F.3d at 105 (citing Rosa v. McCray, 396 F.3d 210, 226 (2d Cir. 2005) (Straub, J., concurring in part and dissenting in part)).

This Court need not decide the question of which harmless error standard applies because the error committed at Holmes's trial was harmless under any of the applicable standards.  As the Supreme Court has recognized, proving that a trial error was harmless under the Brecht standard is "less onerous" than proving that a trial error was harmless under Chapman.  See Brecht, 507

---

[6]In the course of making a ruling on alternative grounds, the Supreme Court has, without discussion, applied the Brecht standard to determine whether a trial error was harmless in an instance where the federal habeas court was the first court to conduct harmless error review.  See Penry v. Johnson, 532 U.S. 782, 795-96 (2001).  The Second Circuit has characterized this application of Brecht as "dicta," however.  Benn, 402 F.3d at 105.

U.S. at 637; accord Gutierrez, 389 F.3d at 303; Lind v. Artuz, 2001 WL 262662, at *10 n.13

(S.D.N.Y. Mar. 15, 2001), aff'd, 2002 WL 83699, at *1 (2d Cir. Jan. 17, 2002); Rosenberg v.

Irvin, 1996 WL 622212, at *3 (E.D.N.Y. Oct. 22, 1996); see also Benn, 402 F.3d at 105

(Chapman standard is "more defendant-friendly") (citations omitted).  As a result, if the state

were able to carry its burden of proving that the error committed at trial was harmless under the

more stringent Chapman standard, it certainly could carry its burden of proving harmlessness

under the more lenient standard set forth in Brecht.  See Gutierrez, 389 F.3d at 305 ("Chapman is

considerably more generous to prejudiced defendants than is Brecht.  Chapman, after all, requires

a reviewing court to be convinced beyond a reasonable doubt that the error was harmless, while

Brecht requires a reviewing court to identify a substantial and injurious effect on the verdict.")

(footnote omitted).  As is discussed in further detail below, the state here has carried its burden of

demonstrating that the error committed at Holmes's trial was harmless under any of the

applicable standards since it has shown that the trial court's decision to admit the identification

testimony was "harmless beyond a reasonable doubt."  Chapman, 386 U.S. at 24.

### 2.  Factors Relevant to the Harmless Error Analysis

"The burden of proving [an] error's harmlessness 'falls to someone other than the person

prejudiced by it.'"  Gutierrez, 389 F.3d at 303 (quoting Chapman, 386 U.S. at 24).  "In making a

determination of harmless error, the court looks to the record as a whole, considering the overall

strength of the prosecution's case, the importance of the improperly admitted evidence, and

whether the evidence was emphasized at trial."  Brown, 355 F.3d at 92 (citing cases); see also

Raheem, 257 F.3d at 141 ("[E]vidence of record that is unrelated to an identification but that is

supportive of a finding of guilt is properly considered in harmless-error analysis.").  "In assessing

the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury." Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) (internal citations and quotation marks omitted). "Although the strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless, the mere fact that the properly admitted evidence, standing alone, would have been sufficient to support the conviction is not determinative of whether" the decision to admit the evidence was harmless. Id. (citations and internal quotation marks omitted). While the burden to show harmlessness is a significant one, courts have not hesitated to find the admission of improper identification evidence to have been harmless in appropriate circumstances. See, e.g., Dunnigan v. Keane, 137 F.3d 117, 130 (2d Cir.) (any error in admitting identification testimony held harmless where there were, inter alia, corroborating eyewitness identifications linking petitioner to the crime, videotapes showing the petitioner attempting to utilize the fruits of the crime, and evidence establishing that distinctive apparel worn by the assailant was owned by the petitioner), cert. denied, 525 U.S. 840 (1998); see also Kennaugh v. Miller, 289 F.3d 36, 48 (2d Cir.) (any error in admitting identification testimony held harmless where there was "powerful" evidence of petitioner's guilt independent of the identification testimony), cert. denied, 537 U.S. 909 (2002); Bilbrew v. Garvin, 2001 WL 91620, at *9 (E.D.N.Y. Jan. 10, 2001) (any error in admitting identification testimony held harmless given the "very strong" evidence against petitioner "[e]ven absent the challenged identifications," which included corroborated testimony establishing petitioner's involvement in the crime).

3. <u>Analysis</u>

We now examine each of the factors set forth in <u>Brown</u>: (a) the overall strength of the prosecution's case, (b) the importance of the improperly admitted evidence, and (c) whether the evidence was emphasized at trial.

a. <u>The overall strength of the prosecution's case</u>. The prosecution's case against Holmes was founded upon substantial evidence that was entirely unrelated to the identification testimony. This evidence pointed to the inexorable conclusion that Holmes was the individual who murdered Brown.

As a preliminary matter, the state easily demonstrated that Holmes had a motive to murder Brown. The evidence presented at trial established that, on the afternoon of October 14, 1994, Nathaniel Brown got into an argument with Rhonda Brown, his stepdaughter, during the course of which Brown grabbed Rhonda, thereby causing the two of them to slide down a nearby staircase. (<u>See</u> K. Brown: Tr. 263-65; Richardson: Tr. 480-81, 488-89). Following this altercation, Rhonda Brown stated her intent to exact revenge on her stepfather, (<u>see</u> Richardson: Tr. 489), and contacted her boyfriend, Holmes. (<u>See</u> K. Brown: Tr. 268-70; Lamar: Tr. 298). Karen Brown informed Holmes of the fight between Rhonda and Nathaniel Brown. (<u>See</u> K. Brown: Tr. 270). Holmes thus had a strong motive to harm Nathaniel Brown.

Next, the evidence established that every step Holmes took that evening was part of an effort to locate Brown. After the altercation between Nathaniel Brown and Rhonda, Holmes asked Karen Brown where Nathaniel Brown was and she informed him that he was either at Richardson's apartment located on 102nd Street or at his own apartment located at 1806 Amsterdam Avenue. (<u>See</u> K. Brown: Tr. 270). At approximately 8:30 p.m. that same evening,

an individual matching Holmes's description went to Richardson's apartment building looking for Brown. (See Sails: Tr. 691-92, 696-701, 705; R. Richardson: 1276, 1281-82). There can be no doubt that this individual was Holmes for several reasons. First, Holmes contacted Karen Brown to confirm that he was at the correct address. (See K. Brown: Tr. 273-74); Resp. Mem. at 12 (citing telephone records admitted at trial as Exhibits 19A and 19B)). Second, the surname "Jenkins" was one Holmes had used in the past and he signed his name as "S. Jenkins" in the visitors' logbook. (See Sails: Tr. 705, 708, 722-23; Tr. 1433). Third, Rhonda Brown testified that she recognized Holmes upon viewing the surveillance videotape taken from the security booth at Richardson's apartment building. (Tr. 1448-49). Fourth, Detective Speer testified that the individual who appeared on the videotape resembled Holmes in terms of his build and stature. (See Speer: Tr. 520, 527-28, 567-68, 571). Finally, the surveillance videotape showed that the individual who appeared on the videotape was chewing a toothpick and several toothpicks were found on Holmes at the time of his arrest. (See Mueller: Tr. 1149-50, 1158-59, 1261-62).

After entering Richardson's apartment building, Holmes proceeded to Richardson's apartment and asked Richardson's son if he knew of Nathaniel Brown's whereabouts. (R. Richardson: Tr. 1279-82). Richardson's son informed Holmes that he did not know where Brown or his father were at the time. (R. Richardson: Tr. 1281-82).

Holmes's presence at Richardson's apartment building at this time is significant because it placed him in the vicinity of Brown's apartment building at around the time of the murder. There was testimony that it was approximately a five minute drive from Richardson's apartment building to Brown's apartment building under normal traffic conditions. (See Richardson: Tr.

481).  Thus, Holmes undoubtedly had the ability to drive to Brown's apartment building by 9:00 p.m., the approximate time at which Brown was killed.  (See Sandoval: Tr. 397).

Holmes contacted Karen Brown on another occasion that evening – this time to confirm that Brown's address was in fact 1806 Amsterdam Avenue – and Karen Brown again provided Holmes with the address at that time.  (K. Brown: Tr. 275).  Thus, before considering any further evidence in the case, it was clear that Holmes was absolutely determined to locate Brown – a person with whom he would obviously have been very angry.  It would seem virtually impossible that there would have been – at the exact same moment – some other individual in the world who was also absolutely determined to find Brown and who also had a motive to harm him.

Yet, there was still additional evidence linking Holmes to the murder.  Putting aside the testimony regarding the lineup identification, the eyewitnesses to the crime consistently described the shooter as an individual who was light skinned, stocky and/or of a height similar to Holmes's actual height.  Sandoval described the assailant, whom he observed on the sidewalk nearby prior to the shooting, as being approximately 5'10" tall, as having a lighter skin tone than himself, and as having a "strong" build.  (Sandoval: Tr. 398-99).  DeJesus described the assailant as being approximately 5'8" or 5'10" tall.  (DeJesus: Tr. 907, 914).  Flowers described the assailant as a "light skinned" black male with a "broad" build.  (Flowers: Tr. 804).  At the time of his arrest, Holmes informed Detective Mueller that he was 5'8" tall and weighed 185 pounds.  (Mueller: Tr. 1156).  Holmes's lineup photograph, of course, also depicts an individual who is light skinned and of stocky build.  See Lineup Photograph.

The description of Holmes's clothing also matched that of the shooter. Based upon his observations of Holmes at Richardson's apartment building, Sails described Holmes as wearing a black knit hat which was covering his eyebrows and a "greenish gray" jacket with the collar turned up. (Sails: Tr. 700-01). Richardson's son testified that Holmes was wearing a black winter hat, black pants, and a green jacket when he came to the door of Richardson's apartment. (R. Richardson: Tr. 1282). The surveillance videotape taken from Richardson's apartment building confirms that Holmes was in fact wearing a black knit hat and a green army jacket prior to the shooting. (See Mueller: Tr. 1262). Significantly, at the scene of the shooting, Sandoval testified that the assailant was wearing a "dark" winter hat covering the lower part of his forehead, including his eyebrows, and a "brown light jacket" that appeared to be an "army jacket." (Sandoval: Tr. 400-01). DeJesus testified that the assailant wore a black winter hat and an "olive green" or "green" military jacket with the collar "[a] little lifted up." (DeJesus: Tr. 903-05). Flowers described the assailant as wearing a black ski hat and a "green army jacket." (Flowers: Tr. 804-05). Flowers testified that the assailant's black hat came down to his eyebrows and that the collar to his jacket was pulled up to his ears. (Flowers: Tr. 805-06). In fact, Detective Mueller testified that the man he "viewed in the video was wearing a green army jacket and a black knit hat" and that this clothing "correspond[ed]" with the eyewitnesses' descriptions of the perpetrator's clothing. (Mueller: Tr. 1262).

In sum, the prosecution proved that Holmes had a motive to shoot Brown, that he had the opportunity to do so, and that his actions on the evening of the murder were those of an individual hellbent on finding Brown. In addition, it was shown that Holmes went to Richardson's apartment prior to the shooting and that an individual who matched Holmes's

description subsequently shot Brown. Thus, even excluding the lineup identification testimony, the prosecution presented overwhelming evidence that Holmes was the person who shot Brown.

b. The importance of the improperly admitted evidence. We next examine the importance of the improperly admitted identification testimony. Significantly, this case is not one where eyewitnesses made unequivocal in-court or out-of-court identifications. None of the eyewitnesses made an in-court identification. Resp. Mem. at 27. With respect to the testimony relating to the pre-trial lineup, it is difficult even to characterize this testimony as consisting of "identifications" of Holmes inasmuch as none of the witnesses stated that they were certain that Holmes was the person who committed the murder. Indeed, all of the witnesses acknowledged that they had a limited opportunity to view the perpetrator. (See Sails: Tr. 720, 722; Sandoval: Tr. 401, 416, 467-68; DeJesus: Tr. 907; Flowers: Tr. 805-06, 810, 818, 825, 830-31, 871-72).

Sails testified that it was difficult to see the man's face because the hat he was wearing "was pulled low over his eyebrows" and because his collar was turned up. (Sails: Tr. 720, 722). With respect to his viewing of Holmes at the lineup, the following colloquy occurred:

> Q. Were you able to compare anyone in the line-up to the man you saw at your security booth the night before?
> A. Well, at the time, the man holding Number 2 could have been the person at the window the day before.
> Q. Could have been the person at the window the day before?
> A. Right.
> Q. And can you gave us a percent of how sure you were, from zero to one hundred?
> . . .
> A. About seventy to eighty percent.

(Sails: Tr. 718). Sails then noted the similarities between Holmes in comparison to the man he observed in terms of his skin tone, height and build. (See Sails: Tr. 719). On cross-examination, in response to assertions by defense counsel that he "identified the defendant" at the lineup, Sails

reaffirmed that the only assertion he made at the lineup was that Holmes "could have been the person" he observed from his security booth and that he was seventy to eighty percent certain at the lineup that Holmes was the same person. (See Sails: Tr. 740-41).[7]

Sandoval testified that he was unable "to get a good look" at the assailant's face "because [the man] always had his head down." (Sandoval: Tr. 416). Sandoval did not testify on direct examination that he made an identification at the lineup, but only that "the two people that looked most alike [in comparison with the assailant] was Number 5 and Number 2." (See Sandoval: Tr. 417). He said this was so "because of the color of their skin." (Sandoval: Tr. 417). After Sandoval asked Holmes and the man seated in position number five to stand up, he noted various similarities between Holmes and the assailant, including his build, his height, "the way he stood up," and his skin tone. (Sandoval: Tr. 418-19). On cross-examination, Sandoval stated that, although he identified both Holmes and the person seated in position five as fitting the description of the assailant (see Sandoval: Tr. 453), his attention was drawn to Holmes because he "looked like" the assailant. (Sandoval: Tr. 453-54).

DeJesus testified that he was not able to see the assailant's face. (DeJesus: Tr. 907). He also testified, on direct, cross, and re-cross-examination, that he did not identify anyone at the pre-trial lineup. (DeJesus: Tr. 912-13, 917, 922). On re-direct examination, he testified only that, at the lineup, Holmes had a "similar" appearance in comparison with the assailant. (DeJesus: Tr. 919-20). On re-cross-examination, he testified that Holmes was the only one in the group who had the same complexion as the assailant. (DeJesus: Tr. 920-21).

---

[7]In his testimony, Detective Mueller named the individuals who viewed the lineup, (see Mueller: Tr. 1154), and, on cross-examination, agreed with a statement made by defense counsel that Sails had "identified somebody in the line-up." (Mueller: Tr. 1250).

Finally, Flowers testified that because the assailant's black hat came down to his eyebrows, and because the collar to the man's jacket was pulled up to his ears, she could only see his face from his eyebrows to his chin. (Flowers: Tr. 805-06). She also testified that, during the time she had to observe the assailant, he "always had his head down." (Flowers: Tr. 810). In fact, Flowers explicitly stated that she did not look at the assailant because she was "scared." (Flowers: Tr. 872). As to what occurred at the lineup, the following colloquy took place:

> Q. When you looked at the line-up, can you describe like where you were and where the men in the line-up where?
> A. The men in the line-up -- I was on the one side of the glass and they were up in another room, against the wall.
> Q. And when you saw the men in the line-up, were they always seated . . . as they are in that picture or did they ever stand up?
> A. I believe they stood up. I don't remember.
> Q. When you looked at the line-up, were you able to compare anyone in the line-up to the man who did the shooting the night before?
> A. I had -- when I saw the line-up, I said that the guy was light. Okay? And I went with that I saw a light person there and the shoulders and that's who I said it looked like.
> Q. And what number was that person in the line-up?
> A. It was Number 2.
> Q. Now, could you be sure Number 2 was the same guy as you had seen?
> A. No, I wasn't sure.

(Flowers: Tr. 817-18). Flowers then testified that Holmes's height, build, and skin tone at the lineup were similar to those of the assailant. (Flowers: Tr. 818-19). On cross-examination, Flowers reaffirmed that she was drawn to Holmes at the lineup because he was "light" and "broad" like the assailant. (Flowers: Tr. 862-64). Although defense counsel implied on cross-examination that Flowers had "picked" Holmes out of the lineup, (see Flowers: Tr. 884), Flowers again confirmed that Holmes was the only participant in the lineup with a complexion similar to that of the assailant and that she told officers at the time of the lineup that she was "not sure" as to whether Holmes was the assailant. (Flowers: Tr. 858, 862). On re-cross-examination, in

response to a question from defense counsel asking why she "picked out" Holmes from the lineup, Flowers stated merely that Holmes "was lighter skinned and looked similar" to the assailant. (Flowers: Tr. 891).

The weakness of the witness's "identifications" is a critical factor in the harmless error analysis. Holmes argues that the error committed at trial was not harmless because, "[a]lthough the prosecution presented circumstantial evidence of [his] motive and opportunity" to murder Brown, "the lineup witnesses' suggestive identifications . . . were the only direct evidence linking [him] to the shooting." Pet. Mem. at 30; see also id. ("There were no eyewitnesses to the shooting or the surrounding events other than those who viewed the suggestive lineup."). This is a case, however, where the properly admitted circumstantial evidence was far stronger than the weak "direct" evidence referred to by Holmes. The only "direct" evidence to which Holmes could possibly point consisted only of statements from the witnesses that Holmes's appearance was similar to that of the assailant – statements that can barely be characterized as "identifications." Moreover, that the prosecution's case was built on circumstantial evidence is not by itself of any great significance for the purpose of determining whether the error was harmless. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("Guilt beyond a reasonable doubt may be established entirely by circumstantial evidence, and this evidence must not be reviewed piecemeal, but rather as a whole.") (citations omitted); accord Roldan, 78 F. Supp. 2d at 268 (citing cases).

Holmes argues that the lack of physical evidence connecting him to Brown's murder requires the conclusion that the error committed at trial was not harmless. Pet. Mem. at 30, 33. In two instances where it has found that the state trial court erred in admitting identification

testimony, the Second Circuit has relied upon the fact that there was no physical evidence connecting the petitioner to the crime in concluding that the admission of the improper evidence was not harmless error. See Raheem, 257 F.3d at 142-43; Wray, 202 F.3d at 530. However, in both of these cases, the identification testimony was the only reliable evidence presented by the state and that testimony was heavily relied upon by the prosecutor in establishing the state's case. See Raheem, 257 F.3d at 142-43 (noting that the state presented no evidence other than the erroneously admitted identification testimony connecting the petitioner to the crime and that the state "emphasized" that testimony in its summation); Wray, 202 F.3d at 530 (erroneous admission of identification testimony not harmless "[g]iven the frailties in the State's properly admitted evidence" and the prosecutor's "emphasis" on the suggestive identification testimony).

That is not the situation presented by the facts of this case. Here, the erroneously admitted testimony could not even be considered reliable evidence due to the tentativeness of the witnesses' supposed identifications. Moreover, here, unlike in Raheem and Wray, the state presented substantial evidence, aside from the erroneously admitted identification testimony, connecting Holmes to Brown's murder. The properly admitted evidence overwhelmingly established that Holmes shot Brown. In addition – as is discussed in the next section – the prosecutor did not focus on the tentative identification testimony in presenting her case to the jury. Rather, the prosecutor sought to establish Holmes's identity by directing the jury's attention to the consistent, corroborated descriptions of the assailant provided by the eyewitnesses. As a result, Holmes's argument on this score must be rejected. See United States v. Dukagjini, 326 F.3d 45, 62 (2d Cir. 2003) (any error in admitting testimony held harmless where the testimony was "corroborative and cumulative" of other evidence and the government's summation "focused

mostly on" the other evidence in the case) (citation omitted), cert. denied, 124 S. Ct. 2832 (2004); Haymon v. New York, 332 F. Supp. 2d 550, 559 (W.D.N.Y. 2004) (any error in admitting evidence held harmless where the evidence was "not critical to obtaining a conviction" and the prosecutor did not emphasize the evidence in summation); see also Wray, 202 F.3d at 526 ("[W]here the wrongly admitted evidence was cumulative of other properly admitted evidence, it is less likely to have injuriously influenced the jury's verdict.").

Because of the tentative and weak nature of the lineup identifications, that evidence can only be viewed as paling in comparison with the strong evidence presented at trial establishing Holmes's guilt. The Court would be much more concerned about the importance of the improperly admitted evidence if any of the witnesses had testified that they were certain of their identifications. But that simply was not the case. Moreover, the suggestiveness of the identification itself was made plain to the jury, thus undermining any persuasiveness that even the tentative identifications might otherwise have had. Where the jury was presented with such equivocal evidence regarding the lineup identifications, it cannot be said that the lineup evidence had any significance.

c. <u>Whether the evidence was emphasized at trial</u>. The third question is "whether the wrongly admitted evidence was emphasized in arguments to the jury." Wray, 202 F.3d at 526 (citing cases). Holmes contends that the prosecutor relied upon the identification testimony extensively during trial, and he points specifically to the prosecutor's opening statement, the prosecutor's direct examination of certain witnesses, and the prosecutor's summation to support this contention. See Pet. Mem. at 31-33. In fact, the prosecutor did not emphasize the lineup identifications during the course of trial. Rather, to the extent that the prosecutor discussed the

issue of identification, it was almost invariably in the context of discussing the witnesses' own descriptions of Holmes at the time of the incident – not the witnesses' identification of Holmes at the lineup.

In her opening statement, the prosecutor focused upon evidence other than the identification testimony including, inter alia, Holmes's motive in shooting Brown, how Holmes came to learn of Brown's whereabouts through his telephone conversations with Karen Brown, the witnesses' descriptions of the assailant, and the surveillance videotape depicting Holmes at Richardson's apartment building. (See Tr. 213-17, 220-22, 224). The prosecutor referred to the lineup only once in her opening statement. Even in this mention, however, the prosecutor made no reference to Holmes's having been positively identified at the lineup. Rather, she stated that, after looking at the lineup, the witnesses stated that Holmes "looked like the man they saw in the black hat and green army jacket," that he "could have been the man," but that "they couldn't be sure." (Tr. 225-26).

Similarly, in her summation, the prosecutor focused almost entirely upon evidence other than the identification testimony, including, inter alia, the phone records and Holmes's conversations with Karen Brown, the security booth's surveillance videotape, the handwriting evidence matching Holmes's signature to the signature in the visitors logbook, Holmes's use of a known alias in signing the logbook, the witnesses' descriptions, and Holmes's motive for shooting Brown. (See Tr. 1597-98, 1600-13, 1618). The prosecutor barely pointed to the identification testimony at all in her summation, and when she did she acknowledged that the witnesses had not "positively identified" Holmes in the lineup and that the witnesses' identifications were tentative "because they never got a good look at the killer's face."

46

(Tr. 1615-16). In her summation, instead of inviting the jury to give weight to the lineup identification testimony, the prosecutor pointed the jury to the witnesses' descriptions of the assailant and discussed how those descriptions were consistent with Holmes's actual physical characteristics and his attire on the night in question. (See Tr. 1603, 1610-12, 1618).[8]

The prosecutor did not invite the jury to consider the identification testimony in determining Holmes's guilt or innocence for a very obvious reason: the identifications themselves were tentative. In fact, in his summation, defense counsel acknowledged that the prosecutor would not want the jurors to rely on the identification testimony in making their ultimate determination concerning Holmes's guilt or innocence. (See Tr. 1555, 1572-73).

Given the tentativeness of the identifications and considering the ample other evidence adduced at trial supporting Holmes's guilt, it cannot be reasonably doubted that the tentative lineup identifications were not used to convict Holmes. Notably, defense counsel's cross-examination made the tentativeness of the identifications clear and also made clear that, to the extent that the witnesses did identify somebody in the lineup, those identifications were based only on the distinguishing characteristics they had observed in the assailant. (See Sails: Tr. 733-34, 740-41; Sandoval: Tr. 450-54; Dellacruz: Tr. 917, 920-22; Flowers: Tr. 858, 862-64, 891); see also Kennaugh, 289 F.3d at 48 (any error in admitting in-court identification harmless given

_____

[8]In his brief, Holmes cites to a portion of the prosecutor's summation in which she made the following comment: "Remember what those eyewitnesses said about . . . Holmes in that lineup." Pet. Mem. at 33 (citing Tr. 1628) (internal quotation marks omitted). At this point in her summation, however, the prosecutor was imagining what closing argument to a jury an attorney would make if someone other than Holmes had been charged with Brown's murder. (See Tr. 1627-29). Of course, what the eyewitnesses "said about . . . Holmes in that lineup" did not constitute a reference to Holmes's having been identified positively by anyone and could just as easily be taken as a reference to the repeated testimony that the assailant was "similar" to Holmes in certain respects.

the "powerful independent evidence of petitioner's guilt" as well as "the fact that on cross-examination, the petitioner was able effectively to challenge the credibility and reliability of [the witness's] in-court identification").  Defense counsel then repeatedly referred to the suggestiveness of the identification and the tentativeness of the identifications in his own closing arguments.  (See Tr. 1555, 1571-77, 1588, 1592).  Thus, the witnesses' inability to make an identification at the lineup did not bolster the prosecution's case.

D.  Summary

Because the trial court's decision to admit the identification testimony could not have played a role in the jury's decision to convict Holmes, any error resulting from the admission of the identification testimony at trial was "harmless beyond a reasonable doubt."  Chapman, 386 U.S. at 24.

Conclusion

_____ For the foregoing reasons, Holmes's petition should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections.  See also Fed. R. Civ. P. 6(a), (e).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Loretta A. Preska, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Preska.  If a party fails to file timely objections, that party will not be permitted to raise

any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140

(1985).

Dated: May 4, 2005
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Eunice C. Lee
Office of the Appellate Defender
45 West 45th Street, 7th Floor
New York, NY 10036

Mary C. Farrington
Assistant District Attorney
One Hogan Place
New York, NY 10013


Hon. Loretta A. Preska
United States District Judge

any objections to this Report and Recommendation on appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140

(1985).

Dated: May 4, 2005
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Eunice C. Lee
Office of the Appellate Defender
45 West 45th Street, 7th Floor
New York, NY 10036

Mary C. Farrington
Assistant District Attorney
One Hogan Place
New York, NY 10013


Hon. Loretta A. Preska
United States District Judge